# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **GARY COFIELD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | **Case No.: 2:02-CV-2436-RDP** |
| **AUTOZONE STORES, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it Defendants' Motion for Summary Judgment (Doc. # 29).[1]  The motion has been fully briefed and was under submission as of January 25, 2005.  (Doc. # 26).

Plaintiff Gary Cofield has brought suit against Defendants AutoZone Stores, Inc. and AutoZone, Inc. (hereinafter collectively "AutoZone") alleging that during his employment as the Assistant Store Manager at AutoZone, Defendants improperly classified and compensated him as an "exempt" employee under the Fair Labor Standards Act, 42 U.S.C. §§ 201 et seq. ("FLSA") and therefore, improperly denied him overtime pay for hours worked in excess of forty hours per week. (Complaint, ¶¶15-25).[2]  It is undisputed that Plaintiff's claims relate exclusively to the eleven-month

---

[1] Although the motion appears to be asserted by only Defendant AutoZone, Inc., the parties have orally informed the court that they stipulate that the motion was filed on behalf of both Defendants, AutoZone, Inc. and Autzone Stores, Inc. and addresses all claims in this case.

[2] Although Plaintiff's complaint also purported to assert claims on behalf of all other similarly situated Assistant Store Managers and Store Managers under the collective action provisions of 29 U.S.C. § 216(b), Plaintiff has abandoned his attempts to "certify" this action as a collective action. (Doc. # 22).

period between October 3, 1999 and September 10, 2000.[3]

Defendants argue that summary judgment is due to be granted because AutoZone properly classified Plaintiff as an exempt employee under the FLSA and regardless, even if Plaintiff could show that he was a non-exempt employee prior to September 10, 2000, AutoZone would nonetheless be entitled to summary judgment because Plaintiff's claim is time-barred under the applicable "willful violation" statute of limitations set forth in 29 U.S.C. § 255(a).  For the reasons outlined below, the court finds that Defendants' motion for summary judgment is due to be granted.

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

---

[3] Although Plaintiff's complaint indicates that his claims against AutoZone under the FLSA arise from the three-year period preceding his complaint (*i.e.*, from October 3, 1999 to October 3, 2002), on September 10, 2000 AutoZone began classifying and paying Assistant Store Managers as non-exempt hourly employees (and began paying hours in excess of 40 per week at a time-and-a-half rate).  Therefore, there is no dispute that Plaintiff's claims relate only to the period from October 3, 1999 to September 10, 2000.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## II.    Relevant Undisputed Facts[4]

AutoZone is a retail automobile parts sales company headquartered in Memphis, Tennessee. (Knighten Dec., Ex. E,  ¶ 2; Colley Dep., Ex. C, p. 8). During the time period relevant to this case (1999-2000), AutoZone had approximately 2,700 to 2,800 stores. (Knighten Dep., p. 22).[5]  Plaintiff started working at AutoZone in 1989, and he eventually moved to work at its Pell City location where he worked until October 2001. (Pl. Dep., p. 16, 21, 31).

During the time period relevant to this case, the typical AutoZone store was staffed with what AutoZone calls the "Do It Yourself" ("DIY") employees – one Store Manager, one Assistant Store Manager ("ASM"), one or more Parts Sales Managers ("PSM"), and non-managerial "red shirts." (Knighten Dec.,  ¶ 4). Certain stores – including Plaintiff's – also employed persons who worked

---

[4] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

[5] AutoZone stores are grouped into geographical regions, each of which has between 40 and 60 stores. (Knighten Dep., Ex. D, p. 23). Each region is under the supervision of a Regional Manager. (Colley Dep., p. 8). Within each region, there are a number of "districts" which, in turn, have approximately nine to eleven stores, all of which are under the purview of a District Manager. (Knighten Dec., ¶ 2).

in commercial sales operations within the store ("commercial employees").  (Knighten Dec., ¶ 4).

Plaintiff was promoted to ASM in 1996 and served in that role until October 2001 when he left the company. (Pl. Dep., p. 32-33).  Plaintiff's store typically employed between twelve and fourteen employees including the Store Manager, ASM, PSMs, red shirts, and commercial employees (Pl. Dep., p. 57), and was normally open anywhere from 81 to 89 hours per week, depending on levels of sales, the number of daylight hours, and other factors  (Pl. Dep., p. 49).

## A.    Management at AutoZone

During the relevant time period, the management of each individual store was split between the Store Manager and ASM.[6]  (Knighten Dec., ¶ 2). Both the Store Manager and the ASM were paid on a salary basis until September 10, 2000, when the ASM position became an hourly-paid position. (Knighten Dec., ¶ 5).  At that time, the ASM was the second-highest paid employee in a given store (behind the Store Manager)  (Knighten Dec., ¶ 12), and the pay ranges for ASMs were considerably higher than for the subordinate AutoZoners (Knighten Dec.,  ¶ 12).  At all times relevant to this action, every ASM at AutoZone made well in excess of $250 per week.    (Knighten Dec.,  ¶ 12).[7]

The Store Manager and the ASM typically were scheduled to work a total of 50 hours each per week. (Knighten Dec., ¶ 6; Pl. Dep., p. 67-68).  They were normally scheduled so that there was little overlap between their schedules and, except for the overlap time, each was the manager on duty

---

[6] Jerry Colley, AutoZone's former Senior Vice-President, testified, the "assistant manager was clearly a partner in running th[e] store." (Colley Dep. p. 26).  Ben Knighten, AutoZone's Director of Retail Process Improvement and a former Store Manager, testified that an ASM was "essentially a Store Manager waiting for a store" and did not need much, if any, additional training once promoted to Store Manager.  (Knighten Dep. p. 35).

[7] Plaintiff received a weekly salary of $658.50 in 1999 (an annual salary of approximately $34,242).  (Knighten Dec., ¶ 12).

when he was at the store. (Knighten Dec., ¶ 5).[8]  Plaintiff testified that approximately 90% of the

time, he and the Store Manager did not overlap working at the store.  (Pl. Dep. p. 67-70).[9]  During

the time that Plaintiff was working, and the Store Manager was not, Plaintiff was "in charge." (Pl.

Dep., p. 70-71).   In fact, the only time he was not completely "in charge" of the store was when his

schedule overlapped that of the Store Manager - "My duties and responsibilities w[ere] to assign

people tasks . . . I did everything when the manager was not there."  (Pl. Dep., p. 84, 108).   Many

times the Store Manager would "push" many of his duties, including supervisory tasks, onto

Plaintiff, even when the Store Manager was at work.  (Pl. Dep., p. 108-09).

Although AutoZone intended for its ASMs to regularly work 50 hours per week (Knighten

Dec., ¶ 6),[10]  Plaintiff worked approximately 10-15 hours over the expected 50-hour week in order

---

[8] On rare occasions where there was overlap time (lunch or store closing), the Parts Sales
Manager ("PSM") was the manager on duty.  (Knighten Dec., ¶ 5).

[9] Plaintiff's summary judgment opposition disputes this prior testimony with a cite to his post-
deposition affidavit. (Doc. # 34, at No. 35).  Although Plaintiff testified at his deposition that his
work schedule (50+ hours a week) only overlapped with the Store Manager's schedule 10% of the
time (Pl. Dep. p. 67-70), he now claims that he overlapped with the Store Manager far more than
that. In fact, Plaintiff alleges that he was *scheduled* to work with the Store Manager at least 10 hours
(of approximately 50) each week and ultimately *did* work with the Store Manager more than that
because he was "coming in on my off days and working extra hours off the schedule."  (Cofield
Dec., ¶ 13).  Plaintiff has not offered any explanation for contradicting his previous sworn deposition
testimony.  The law is clear that a "party cannot . . . create . . . an issue [of fact] with an affidavit that
merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc.
Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Accordingly, the court will consider
only the earlier deposition testimony on this issue.

[10] It would not be unusual for an ASM, as the result of particular business or personal
circumstances, to work several hours more or less than he was scheduled in a work week.  (Knighten
Dec., ¶ 6).

to complete all of the tasks he was assigned.  (Pl. Dep., p. 73-74; 167; Pl. Dec., ¶ 9).[11]  On the days

when Plaintiff came in on his day off, he was often working in the store with the Store Manager and

rarely supervised other employees. (Cofield Dec., ¶ 9).

### B.    Duties of Store Managers and ASMs

When on duty, the Store Manager or ASM ("manager on duty") was expected to fulfill

responsibilities in a number of categories.[12]

### 1.    Supervision of Subordinates

The manager on duty routinely supervised and directed the work of two or more subordinate

employees in the store (Knighten Dec.,  ¶ 7), assigned tasks to hourly employees including PSMs

(Knighten Dec.,  ¶8), and was responsible for setting clear expectations for subordinate employees,

sharing information with them, listening to them and providing positive and constructive feed back.

(Knighten Dec., ¶ 8). Although various store operations were subject to standardized,  predetermined

corporate guidelines, the manager on duty continued to have discretionary responsibility for these

supervisory matters.  (Knighten Dec.,  ¶ 9).

As to his supervisory duties, Plaintiff testified as follows:

Q:    The first thing you said was that you were responsible for directing people
       what to do, supervise the employees?
A:    Yes.
Q:    Would you say that was the main part of your job?
A:    Yes.
Q:    Making sure that other people were doing their job?
A:    Yes.

---

[11] Plaintiff claims that he worked a great deal of time "off the clock." (Pl. Dep., p. 36). Plaintiff claims that he always did whatever it took to get the job done. (Pl. Dep., p. 168; 132-133; 136; 145; 178; 84-85; 69; 72; 75).

[12] PSMs shared some of these duties, which are noted by footnote where applicable.

Q:      That would include the PSMs and all the red shirts, or?
A:      Yes, sir.
Q:      I guess as part of that you were in charge of training those employees on how to do their job?
A:      Yes, sir.
Q:      And making sure when you gave someone an assigned task, they would do it?
A:      Yes.
Q:      Walking around the store and making sure everyone was working and not wasting time?
A:      Yes.

(Pl. Dep., p. 89).[13]  Plaintiff sometimes trained new employees on how to perform the various functions of their jobs (Pl. Dep., p. 89).[14]  Plaintiff had no direct input on employees pay (Pl. Dep., p. 105-106; Knighten Dep., p. 38), although he did have the discretion to send home employees or to alter their schedules, both of which would affect pay. (Pl. Dep., p. 60, 179; Knighten Dec., ¶ 10).

## 2.      Discipline/Recommending Termination

During the relevant time period, Plaintiff spent a large amount of his time disciplining employees who did not perform their jobs or were absent or late without proper excuse or who

---

[13] Plaintiff's opposition to summary judgment indicates that he now "disputes" his prior testimony.  (Doc. # 34, No. 37).   Plaintiff now claims that the most "valuable things" he did for AutoZone were taking care of customers and stocking the store.  (Cofield Dec., ¶ 7).  Plaintiff also claims that he did not prioritize "enforcing company policies" nor did he spend "a large part" of his time training other employees.  (Cofield Dec., ¶¶ 8, 10, 16).  Plaintiff also disputes his testimony that he supervised the PSM, and now claims that the PSM took most of his day-to-day direction from the Store Manager, not from Plaintiff.  (Cofield Dec., ¶ 6).  Plaintiff's efforts to dispute his prior testimony are meritless.  Plaintiff has offered no explanation for the discrepancies, and therefore the court will not consider those "sham" portions of the affidavit that contradict prior testimony.  *Van T. Junkins*, 736 F.2d at 657-59.

[14] Plaintiff's post-deposition affidavit claims that he did not spent a "large part" of his time training employees and that most of the training involved "completing the task and performing the job right along side them."  (Cofield Dec., ¶¶ 10, 16).  Once again, his attempt to change his deposition testimony is subject to the *Van T. Junkins* rule.  *See* discussion footnote 13 *supra*.

otherwise failed to follow AutoZone policies and procedures. (Pl. Dep., p. 91, 94-96, 183-84).[15]

Only the Store Manager and the ASM could discipline employees. (Pl. Dep., p. 95).[16]  Both the

Store Manager and the ASM could recommend termination, but the final decision was made by

corporate personnel at AutoZone. (Pl. Dep., p. 112, 114).  On several occasions Plaintiff

recommended that employees be terminated and, on each occasion, they were, in fact, discharged.

(Pl. Dep., p. 111-12).

### 3.      Plan–o–grams

_____The manager on duty was responsible for verifying the plan-o-gram (which established the

merchandising layout for that store) and making certain that the plan-o-gram was properly followed

and maintained**.** (Knighten Dec., ¶ 9).  This included making sure that all defective and/or recalled

merchandise was removed from store shelves and accounted for.  (Knighten Dec., ¶ 8).

### 4.      Opening/Closing Store[17]

While each store had a checklist for opening and closing the store, it was the responsibility

of the manager on duty to make certain that all checklist items had been performed properly.

(Knighten Dec., ¶ 9).  Plaintiff testified that he was often responsible for opening and/or closing the

---

[15] Plaintiff testified that he had the authority to discipline employees ("write them up") from 1996 to 2001, when AutoZone gave that authority solely to the Store Manager.  (Pl. Dep. p. 95-96).

[16] Although the PSM could suggest discipline, the Store Manager had to sign off on it.  (Pl. Dep. p. 183).  Plaintiff's testimony is somewhat confusing as to whether the Store Manager also had to sign off on the discipline that he (as ASM) imposed.  (Pl. Dep. p. 95-96).  Plaintiff testified that, without doubt, he had the authority to discipline employees from 1996 until the end of 2001 (when AutoZone gave disciplinary authority solely to the Store Manager).  (Pl. Dep. p. 96).  However, Plaintiff also testified – presumably in relation to the post-2001 changes to discipline procedure – that "I could write it. It has to be approved by the manager."  (Pl. Dep. 96).

[17] PSMs also closed the store.  (Pl. Dep., p. 174).

store.  (Pl. Dep., p. 85). When Plaintiff closed the store, he was responsible for locking up the store, placing all necessary items in the safe (Pl. Dep., p. 103-04), and making sure the store was in good shape to open the following day.   (Pl. Dep., p. 101-02).

### 5. Scheduling

AutoZone's corporate office issued detailed guidelines establishing the exact number of employees that should be present in the store at any given time. (Pl. Dep., p. 43-45; 61).[18]  However, the Store Manager and the ASM were given discretion within those guidelines to schedule certain employees at certain times, and they were authorized to make scheduling changes "on the go" including calling in additional staff.  (Colley Dep., p. 28-31; Knighten Dec.,  ¶ 10).[19]  Likewise, the manager on duty had the discretion of sending employees home if all scheduled employees were not needed.  (Knighten Dec.,  ¶ 10; Colley Dep., p. 31).[20]

In his position as ASM, Plaintiff and the Store Manager generally would rotate responsibility for preparing weekly store schedules - i.e., scheduling the store's 12-14 employees so as to provide adequate staffing during the stores 80-90 hours of operation each week.  (Pl. Dep., p. 60, 179).  (Pl. Dep., p. 43-45; 60-61; 179). When Plaintiff prepared the schedules, the Store Manager approved them.  (Pl. Dep., p. 86-87). Sometimes, however, the Store Manager prepared the schedules himself. (Pl. Dep., p. 60; 179; 119).

---

[18] For example, AutoZone determines how many employees will be needed to unload trucks that arrive at the store and how many total employees can be employed by the store. (Pl. Dep., p. 58-59, 62).

[19] Although Plaintiff disputes this fact, he does so with a reference to his deposition that does not address the statement.  (Doc. # 34, No. 25 (citing to Pl. Dep., p. 178)).

[20] Although Plaintiff disputes this fact, he does so with a reference to his deposition that does not address the statement.  (Doc. # 34, No. 25 (citing to Pl. Dep., p. 168; 185).

### 6.    Ordering Stock

Although each store generally operated under an automatic stock replenishment system, the manager on duty could order additional stock based on the needs and circumstances of that particular store.  (Knighten Dec.,  ¶ 10; Pl. Dep., p. 180).

### 7.    Sales Reports[21]

The manager on duty was responsible for preparing and communicating various daily and/or weekly sales and revenue reports to corporate headquarters (Knighten Dec., ¶ 8; Pl. Dep., p. 85-86, 101), and for handling, reconciling, and depositing daily receipts  (Knighten Dec.,  ¶ 8).  Plaintiff testified that he often called in sales figures to AutoZone's corporate headquarters and compiled daily EOC or "end of the day" reports.  (Pl. Dep., p. 85-86, 101). In addition to daily sales reporting, Plaintiff also compiled weekly PCI (revenue) reports and sent them to the corporate headquarters. (Pl. Dep., p. 97-98)**.**

### 8.    Operation of Store in Accordance with AutoZone Guidelines

Even though the operation of an individual store was subject to various standardized guidelines or directives, it was the ongoing responsibility of the manager on duty to make certain that the store was being operated in accordance with those guidelines and directives.  (Knighten Dec., ¶ 11).  Plaintiff felt that he did not spend a great deal of time ensuring compliance with corporate policy. (Cofield Dec., ¶¶  7, 8).

### 9.    Other Non-Managerial Duties

Although AutoZone intended for the manager on duty to have "management" as his primary duty when he was scheduled to work, he nonetheless might spend substantial amounts of time

---

[21]   PSMs also called in sales figures.  (Pl. Dep., p. 86).

waiting on customers, performing stock and inventory duties, and performing other tasks similar to that of subordinate employees. (Knighten Dec., ¶ 7). Mr. Colley, former Senior Vice President of Store Operations, testified: "If there were more customers than there were employees, . . . we obviously expected the store manager or assistant manager or parts sales manager to drop or stop what they were doing and wait on customers. We primarily wanted the management people, store manager, assistant, part sales manager, managing the AutoZoners on duty but . . . we were also [all] hands on deck when the customer needed to be waited on regardless of who was there." (Colley Dep., p. 52-53).[22] Plaintiff testified that he spent a good deal of time waiting on customers, which he believed to be his "most important job." (Pl. Dep., p. 177-78; 180; 183; 185; Cofield Dec., ¶¶ 7, 11).[23]

In addition to the above duties, Store Managers had more authority than ASMs in the following respects: (1) the Store Manager had authority to give a greater refund to customers (Pl. Dep., p. 92-93); (2) the Store Manager was eligible for a quarterly bonus (Knighten Dep., p. 37); (3) the Store Manager could hire employees (Colley Dep., p. 45); and (4) the Store Manager had final approval over store schedules. (Pl. Dep., p. 179).

### C.    Duties of PSMs

The PSM at Plaintiff's store was compensated on an hourly basis and worked an average of 40-45 hours per week. (Cofield Dec., ¶¶ 3, 4). The PSM  typically worked the same schedule as the

---

[22] Colley testified that when he visited AutoZone stores as Senior Vice President, even he waited on customers if necessary. (Colley Dep., p. 84).

[23] Plaintiff maintains in his post-deposition affidavit that he spent the "majority" of his time waiting on customers and restocking. (Cofield Dec., ¶¶ 7, 11). As noted earlier, Plaintiff testified as his deposition that he spent the majority of his time supervising employees (Pl. Dep., p. 184), and he has offered no explanation for contradicting his prior testimony. *Van T. Junkins*, 736 F.2d at 657.

Store Manager (with the exception of when the PSM was scheduled to open or close). (Cofield Dec., ¶ 5). If the Store Manager or the ASM was not in the store, the PSM was "in charge." (Pl. Dep., p. 71). PSMs could handle refunds (Pl. Dep., p. 182), close the store (Pl. Dep., p. 174), call in sales figures (Pl. Dep., p. 86), suggest discipline (Pl. Dep. p. 183), and had keys to the store and safe (Pl. Dep., p. 103-104).

## III.   Applicable Substantive Law and Discussion

The court finds that summary judgment is due to be granted for two alternative reasons: (1) Plaintiff was properly classified as an exempt FLSA employee, and (2) even assuming that Plaintiff was not properly classified, AutoZone's violation of the FLSA was not willful, barring Plaintiff's claims under the applicable statute of limitations.

### A.   Summary Judgment Is Due to Be Granted Because Plaintiff Was Properly Classified as an Exempt Employee under the FLSA

Section 207 of the FLSA requires an employer to pay statutory overtime to any employee working more than forty (40) hours per week, with the exception of "exempt" employees including those employed in bona fide professional, executive or administrative capacities. 29 U.S.C. § 213(a)(1). Although the FLSA does not specifically define the circumstances in which an employee will be deemed to be employed in a "bona fide executive" capacity, the regulations[24] promulgated by the United States Department of Labor to enforce the FLSA establish clear tests for determining

---

[24]On August 23, 2004 (almost two years after this action was filed), the Department of Labor issued revised regulations governing, *inter alia,* the criteria by which employees were evaluated to determine eligibility for exempt status under the FLSA. However, because this lawsuit was filed before these revised regulations became effective, Plaintiff's exempt status will be determined under the regulations in effect prior to August 2004. *See De Jesus-Rentas v. Baxter Pharm. Servs. Corp.,* 400 F.3d 72, 74 n.2 (1st Cir. 2005) (noting that new FLSA regulations were inapplicable to action filed in 2003).

whether an employee is an exempt executive under the statute.

Both parties agree that Plaintiff's exemption status is to be analyzed under the "short test" established under 29 U.S.C. § 541.1(f).[25]  "Under the short test, an employee may be classified as a bona fide executive employee if: (1) the employee is paid on a salary basis, and (2) the employee's primary duty consists of management of the enterprise in which the employee is employed or of a customarily recognized department thereof, and includes the customary and regular direction of the work of two or more other employees therein." *Debrecht v. Osceola County*, 243 F.Supp. 2d 1364, 1368 (M.D. Fla. 2003) (citing 29 C.F.R. § 541.1(f)).  In the present case, it is undisputed that prior to September 10, 2000, Plaintiff was compensated on a true salary basis.[26]

Accordingly, the court must determine whether Plaintiff (1) customarily and regularly supervised two or more employees *and*, (2) had management as his primary duty. 29 C.F.R. § 541.119;  *Bradford v. Bed Bath & Beyond, Inc.*, 184 F.Supp.2d 1342, 1345-46 (N.D. Ga. 2002). Plaintiff maintains that he meets neither requirement.

### 1.    Customarily and Regularly Supervises Two or More Employees

The regulations provide,  "[a]n employee will qualify as an 'executive' under § 541.1 only if he customarily and regularly supervises at least two full-time employees or the equivalent."  29 C.F.R. Part 541.105(a).[27]  The Department of Labor's *Field Operations Handbook* explains that "the

---

[25]The regulation applies to "an employee who is compensated on a salary basis at a rate of not less than $250 per week . . . ." 29 U.S.C. § 541.1(f). It is undisputed that Plaintiff earned a fixed salary well in excess of $250 per week.  (Knighten Dec.,  ¶ 12.)

[26]Plaintiff testified that when he was a salaried employee, he was paid his full salary each week regardless of whether he missed work for vacation or illness. (Pl. Dep., pp.171-72.)

[27] The "equivalent" is defined as follows:  "For example, if the 'executive' supervises one full-time and two part time employees of whom one works morning and one, afternoons; or four part-

total number of hours worked by subordinate employees in a [work week] must equal 80 in order to constitute the equivalent of two full time employees." *Field Operations Handbook*, Chapter22c00(b); *see also Herman v. Harmelech*, 2000 WL 420839 at *7 (N.D. Ill. April 14, 2000) (holding that managers of a jewelry store did not qualify for the executive exception where none of them supervised employees working more than a total of eighty hours per week); *Murray v. Stuckeys, Inc.*, 50 F.3d 564, 568-69 (8th Cir. 1995) (quoting U.S. Department of Labor's Field Operations Handbook); *Secretary of Labor v. Daylight Dairy Products, Inc.*, 779 F.2d 784, 787 (1st Cir. 1985) (finding the 80-hour rule to be reasonable). Therefore, in order to ascertain whether Plaintiff customarily and regularly supervised two or more employees**,** the court must determine whether Plaintiff supervised at least 80 hours worth of work per week.

Relying upon cases from other circuits, Plaintiff maintains that "customarily and regularly" can be met only if the two or more supervised employees worked a total of 80 hours per week for at least **80% of the disputed weeks**.  (Doc. # 33, at 5 (citing to *Secretary of Labor v. Daylight Dairy,* 779 F.2d 784, 788 (1st Cir. 1985)("[N]o manager …met the 80-hour requirement more than 76 percent of the time…[and] that falls short of 'regular and customary' supervision of 80 hours of work."); *Jackson v. Go-Tane Services*, 56 Fed. Appx. 267, 272 n.8 (7th Cir. 2003) ("[T]he car wash attendants that Jackson supervised worked the requisite 'full-time' schedule [i.e., a total of 80 hours a week] only 67% of the time that they were under Jackson's supervision.").  Plaintiff argues that the 80% rule "is a useful guide in determining what constitutes 'customarily and regularly' and is consistent with Department of Labor policy." (Doc. # 33, at 5-6 n.7).

---

time employees, two of whom work mornings and two afternoons, this requirement would be met."
29 C.F.R. Part 541.105(a)

The court will assume, without deciding, that the 80 hour/80% rule applies in this case.   It is clear, however, that the calculations employed by Plaintiff to analyze this rule are riddled with errors and, in many cases, are contrary to the undisputed evidence.  When those errors are corrected, as set forth below, it becomes clear that Plaintiff **meets his own test** and was, in fact, an exempt employee who "customarily and regularly" supervised at least 80 hours worth of work at least 80% of the disputed weeks.

First, it is important to reiterate that there are only 49 weeks at issue in this case – the period from October 3, 1999 until September 3, 2000.  Accordingly, Plaintiff's exempt status must be determined by an analysis of whether he supervised at least 80 hours of work during those disputed weeks.  Plaintiff maintains that he does not satisfy the 80 hour/80% rule, but he does so based on the erroneous analysis of hours worked during *all 104 weeks* in the years 1999 and 2000 (as displayed in Exhibit 4 to Plaintiff's deposition which is a chart of total hours worked by all employees in Plaintiff's store from 1999-2000).  (Doc. # 33, at 7-8).  When Plaintiff's analysis is applied to the appropriate time frame – the 49 disputed weeks – it is clear that Plaintiff did supervise at least 80 hours of subordinate work 80% of the time.

Plaintiff's 80 hour/80% calculations are based on this equation: Total number of hours Plaintiff was not supervising other employees (calculated through another series of equations set forth below) + 80 hours (the minimum Plaintiff must supervise other employees to satisfy the test) = Minimum number of hours that must be worked in one week by AutoZone employees at Plaintiff's store in order to satisfy the test.  (Doc. # 33, at 7-8).  As explained in more detail below, Plaintiff believes that, at minimum, DIY employees must have worked **at least 310 hours per week** in order for Plaintiff to have supervised at least 80 hours a week.  According to Plaintiff's calculations, he

did not meet the 80 hour/80% supervision requirement because out of the 104 weeks he examined, "there are at least 32 weeks when there were 310 hours or less."  (Doc. # 33, at 7).

As an initial matter, the court must point out that Plaintiff's analysis is flawed from its inception because it assumes that Plaintiff only supervised *DIY* employees, and not the commercial employees who also worked in his store.  (Doc. # 33, at 7). To the contrary, the undisputed evidence is that Plaintiff supervised all AutoZone store employees – DIY and commercial employees alike. (Colley Dep., p. 39-40).  Accordingly, Plaintiff's analysis should have included the hours worked by *all* DIY and commercial employees at his store during the relevant time frame.  Having pointed out that overarching flaw, the court now turns to a more detailed probe of Plaintiff's 310-hour figure.

As best the court can tell, Plaintiff arrived at his 310-hour number based upon the following calculations. First, relying on testimony regarding the typical hours worked by management (the Store Manager, ASM, and PSM), Plaintiff assumes that he did not supervise approximately 140 hours each week when the three managers worked (50 hours each for Store Manager and ASM and 40 hours for PSM).  Contrary to that assumption, however, Plaintiff testified that he did supervise PSMs:

> Q:     The first thing you said was that you were responsible for directing people what to do, supervise the employees?
> A:     Yes.
> Q:     Would you say that was the main part of your job?
> A:     Yes.
> Q:     Making sure that other people were doing their job?
> A:     Yes.
> **Q:     And that would include the PSMs and all the red shirts.**
> **A:     Yes, sir**.

(Plaintiff dep., p. 89) (emphasis added).[28] Accordingly, the correct number of management hours that Plaintiff did not supervise was 100 hours worked by the Store Manager and ASM, not 140 hours.

Next, Plaintiff maintains that he did not supervise another 10 hours because the Store Manager and the ASM overlapped at least 10 hours each week, and Plaintiff testified that he did not supervise when he worked with the Store Manager. Once again, Plaintiff's calculation of the amount of overlap time is based upon his contradictory post-deposition affidavit testimony, not on his initial testimony that he was "in charge" of the store 90% of the time that he worked. (Pl. Dep. p. 67-70). The court must base its analysis on Plaintiff's prior testimony because Plaintiff has offered no explanation for contradicting it. *See* discussion *supra* footnote 13. Accordingly, of the 50 hours Plaintiff assumes he was scheduled to work each week, the court finds that he was "in charge" at least 45 hours a week (90%) and only overlapped with the Store Manager five (5) hours a week, during which time he did not supervise. To summarize, at this point the undisputed evidence shows that Plaintiff was not supervising other employees for only 105 hours each week, not the 150 hours claimed by Plaintiff.

Finally, Plaintiff correctly notes that both the Store Manager and the ASM must separately direct at least 80 hours worth of work to be exempt employees, and therefore he concludes that he did not supervise another 80 hours each week because those hours were supervised by the Store Manager. Compiling those numbers together, Plaintiff concludes that DIY employees must have worked 310 hours each week for Plaintiff to have supervised 80 of those hours because there were

---

[28] It is also clear that AutoZone management expected that Plaintiff would supervise PSMs when he was in charge of the store. (Knighten Decl., ¶ 7). As noted earlier, Plaintiff now impermissibly "disputes" his prior testimony with conclusory statements in his post-deposition affidavit testimony that he rarely supervised PSMs. *See* discussion *supra* footnote 13 (citing *Van T. Junkins & Assoc. Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).

at least 230 hours each week (140 management hours worked + 10 overlap hours + 80 hours supervised by the Store Manager) when Plaintiff was not supervising employees.  However, when applying the corrections noted above, the court finds that there were only 185 hours per week when Plaintiff was not supervising employees (100 hours for Store Manager and ASM work + 5 hours of overlap time + 80 hours of time supervised by the Store Manager), and therefore all AutoZone employees (DIY and commercial) must have worked only **265 hours per week** (185 + 80) in order for Plaintiff to have supervised at least 80 hours a week.

Ironically, even assuming that the erroneous 310-hour threshold applies, and even looking solely to hours worked by DIY employees as Plaintiff's analysis does, the undisputed evidence demonstrates that Plaintiff **still** supervised 80 hours a week for at least 80% of the 49 disputed weeks.  Of the 49 weeks, 41 weeks (or 83.6%) entailed 310 hours of work or more by DIY employees. (Pl.'s Dep. Ex. 4; Doc. # 39, Declaration Exhibit).[29]  Moreover, when the corrected numbers are applied to the undisputed evidence, it is clear that Plaintiff supervised 80 hours a week for 100% of the 49 weeks in dispute.[30]  Accordingly, the court finds that Plaintiff's employment as

---

[29] In fact, of the eight (8) weeks in which AutoZone employees worked less than 310 hours, two (2) weeks contained holidays in which the store was closed (Christmas and Thanksgiving) and two (2) were weeks in which 309 hours were worked. (Pl.'s Dep. Ex. 4; Doc. # 39, Declaration Exhibit).

[30] Of the 49 disputed weeks, DIY employees alone worked over 265 hours each week for all but one week (week of December 19, 1999) when they worked 260.6. (Pl.'s Dep. Ex. 4; Doc. # 39, Declaration Exhibit).  The store was only open for 70 hours during the 260.6-hour week and regardless, the 80-hour rule is easily satisfied when one adds in the 80.2 hours worked by the commercial employees that Plaintiff also supervised that week. (Pl.'s Dep. Ex. 4; Doc. # 39, Declaration Exhibit).  Accordingly, Plaintiff supervised at least 80 hours of subordinate work for all of the 49 weeks in dispute.  AutoZone reaches the same conclusion via different computations:

The average number of AutoZone DIY employees in that store for any given hour during the relevant time period was 3.8893. This is consistent with Plaintiff's deposition testimony that his store typically had between 3.6 and 4 employees in the store at any given time. (Plaintiff

ASM during the disputed eleven-month period easily satisfies the requirement that he "customarily and regularly" supervise two or more employees.[31]

---

Dep., p. 118-19). The lowest average number of employees in the store during any of the weeks at issue was 3.41 (the week beginning 8/13/00) and the highest such number was 4.70 (week beginning 4/2/00). Additionally, the store had an average of 1.17 commercial employees per hour during this period, ranging from a low of 0.85 per hour (10/17/99) to a high of 1.48 (2/6/00).

Plaintiff meets the 80-hour threshold through his supervision of DIY employees alone. Subtracting one hour for each hour worked by Plaintiff, it is clear that when he was in charge, he averaged supervising 2.8893 DIY employees during the relevant time period, ranging from a low of 2.41 employees to a high of 3.7 employees. Accordingly, Plaintiff would clearly meet the 80-hour threshold Plaintiff discusses in his brief if he was "in charge" of the store for only 27.69 or more hours of his 50 hours per week. As Plaintiff testified, he was in charge– working alone without the Store Manager present – approximately 90% of the time he worked. (Plaintiff Dep., pp. 67-70). Assuming Plaintiff only worked the 50-hour workweek he was scheduled for each week, he would have, by his own estimates, been in charge of the store 45 hours per week (approximately 17.31 more hours of supervision than necessary to hit the 80 employee hours supervised standard) and would have supervised an average of 130.9 hours per week. Again, this assumes that only DIY employees are included in the analysis. . . . Plaintiff's store averaged 1.17 commercial employees per hour during the relevant time period. When these employees are lumped with the 2.89 DIY employees Plaintiff supervised on the average hour, the total number of hours Plaintiff supervised per week easily exceeds the 80-hour threshold Plaintiff discusses in his brief.

(Doc. # 37, at 3-4).

[31] Plaintiff also contends that the ASM position at AutoZone cannot be an exempt position because the ASM is not the "sole member of management in the store," but rather "shares responsibility" with the Store Manager for supervision of the same employees. The court rejects this argument because it is contrary to the clear intent of the FLSA and is based on an erroneous interpretation of the regulations. Plaintiff plucks out of context the following statement from § 541.105(e): "An employee who merely assists [shares responsibility with] the manager or buyer of a particular department and supervises two or more employees only in the actual manager's or buyer's absence . . . . does not satisfy the requirement that the employee 'customarily and regularly directs the work of two or more employees therein.'" 29 C.F.R. § 541.105 (e). Under Plaintiff's interpretation of the regulations, an assistant manager would almost *never* qualify as an exempt employee. That is clearly not the intent of the FLSA, and a quick reading of the totality of § 541.105 reveals that  assistant managers most certainly can be classified as exempt "assuming that they meet all the other qualifications." 29 C.F.R. § 541.105 (d)(hypothesizing that a machine-shop supervisor and two assistant machine-shop supervisors "should certainly qualify for the exemption" if they meet

Having determined that Plaintiff customarily and regularly supervised two or more employees, the court must now turn to the analysis of whether Plaintiff had management as his primary duty. 29 C.F.R. § 541.119.

### 2. Management As His Primary Duty

The FLSA regulations provide that "a determination of whether an employee has management as his primary duty must be based on all the facts in a particular case," including the following five factors: (1) the amount of time spent in the performance of the managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the employee exercises discretionary powers; (4) his relative freedom from supervision; and (5) the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103.[32]   The regulations

all the requirements).

[32] Other courts have interpreted the §541.103 factors in this manner:

> The court interprets §541.103 to provide two alternative tests for determining whether an employee has management as his primary duty. The first test is based on the amount of time spent in management duties--if the employee spends over 50% of his time performing management duties, then he has management as his primary duty.  However, if the employee does not satisfy the first test, then the second test comes into play. Under the second test, the court must determine whether, on balance, 'other pertinent factors,' including the four listed in §541.103 --the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor-- support the conclusion that the employee has management as his primary duty. §541.103. (internal citations omitted).

*Thomas v. Jones Restaurants, Inc.,* 64 F.Supp.2d 1205, 1210 (M.D. Ala. 1999).  Whether the court analyzes this case in the context of two alternative tests or five equal factors is of no consequence given that the court has undertaken an analysis of all relevant factors outlined in §541.103.

20

suggest that in the ordinary case, "primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103.  However, they caution that "time alone [] is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion."  29 C.F.R. § 541.103; *see also Thomas*, 64 F.Supp. 2d at 1210. Management duties may include the following functions, although not all of the actions must be performed to sustain a finding than an individual was engaged in "management:"

> Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102; *see also Sturm v. TOC Retail, Inc.*, 864 F.Supp. 1346, 1350 (M.D. Ga. 1994).

### a.       *Donovan v. Burger King Corp.* and Its Progeny

AutoZone points to numerous court opinions which have developed the "primary duty" analysis, many of which address factual scenarios involving managers and assistant managers of multi-store retail operations similar to AutoZone, and all of which find that an employee who is "in charge" of a retail store has management as his or her primary duty regardless of the type of business or the standardization of its operation and regardless of the fact that the manager may frequently perform non-managerial duties.  (Doc. # 30, citing *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) and its progeny).  The seminal case on the applicability of the bona fide executive

exemption in the retail store context is *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982), a case factually similarly to this one.  In *Donovan*, the First Circuit considered whether assistant managers at a number of Burger King restaurants were exempt executive employees under the FLSA. *Donovan*, 672 F.2d at 223.  Each of the stores in question employed one salaried manager and two salaried assistant managers.  *Donovan*, 672 F.2d at 223.  As is the case at AutoZone, the Burger King managers were scheduled such that, except for brief periods of overlap on weekends, only one manager or assistant manager worked at any given time.  *Donovan*, 672 F.2d at 223.  The manager scheduled to work in the store at any particular time was "de facto in charge of the store." *Donovan*, 672 F.2d at 225.

The duties of the Burger King assistant managers were remarkably similar to those performed by Assistant Store Managers at AutoZone:

> While on duty, the assistant manager enjoys decision-making authority roughly commensurate with that of the manager. He schedules employees, assigns work, oversees product quality, and speaks with customers.  Assistant managers also train employees . . . and perform various recordkeeping, inventory, and cash reconciliation duties. Many of these tasks are governed by highly detailed, step-by-step instructions contained in Burger King's "Manual of Operating Data," and admit of little or no variation.  Assistant managers also spend a portion of their time performing many of the same tasks as hourly employees, such as taking orders, preparing food, and "expediting" orders, that is, filling the orders and handing them to the customers. These tasks are also spelled out in great detail in the Manual of Operating Data.

*Donovan*, 672 F.2d at 223.  Although the plaintiffs argued that well-defined company protocol prohibits local managers from being exempt employees, the First Circuit rejected that contention: "The supervision of other employees is clearly a management duty. The fact that Burger King has well defined policies, and that tasks are spelled out in great detail, is insufficient to negate this conclusion. Ensuring that company policies are carried out constitutes the 'very essence of

supervisory work.'" *Donovan*, 672 F.2d at 223.   Moreover, the court found that the fact that a Burger King assistant manager performs substantial amounts of menial work "does not negate the conclusion that his primary duty is management." *Donovan*, 672 F.2d at 223.   Ultimately, the court found the assistant managers to be exempt and held that "the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions." *Donovan*, 672 F.2d at 227.

Although the Eleventh Circuit has not yet considered the *Donovan* "in charge" test, many other district courts in this circuit have relied on *Donovan* and applied its analysis. *See, e.g., Jackson v. Advance Auto Parts, Inc.*, 362 F.Supp. 2d 1323, 1327-34 (N.D. Ga. 2005) (finding that assistant managers at Advance Auto Parts were exempt when the undisputed evidence revealed that they were "in charge" of the store approximately 60% of the time when the store manager was not present and even though the evidence showed that they spent 90% of that time performing non-exempt tasks including selling, operating the register and cleaning the store); *Sturm v. TOC Retail, Inc.*, 864 F.Supp. 1346 (M.D. Ga. 1994) (holding that convenience store manager's primary duty was management even in highly standardized work environment where he screened job applicants, trained hourly employees on the store's register, corrected mistakes by subordinate employees, distributed company policies to new workers, evaluated employees, ordered inventory, handled the store's money, scheduled employees, handled customer complaints and performed bookkeeping functions). [33]

---

[33] Moreover, numerous courts in other circuits have agreed with *Donovan*'s analysis.  *See, e.g., Palazzolo-Robinson v. Sharis Mgmt,* 68 F.Supp. 2d 1186, 1190 (W.D. Wash. 1999) (finding that assistant manager had management as primary duty even though she routinely performed non-managerial tasks such as washing dishes, taking orders, bussing tables and seating customers because "she never stopped being in charge of the facility even while performing other tasks");

**b.** **Plaintiff's Duties Satisfy Both the "In Charge" Test and the §
541.103 Factors**[34]

In this case, Plaintiff has admitted that he is "in charge" of the store approximately 90% of
the time that he works.  (Pl. Dep. p. 67-70).  Furthermore, the undisputed evidence shows that when
he is in charge, Plaintiff's responsibilities include the following management duties: supervision;
training; discipline; scheduling and assignment of tasks to employees; recommending termination
of employees; preparing and transmitting sales and other reports to corporate headquarters; counting
and depositing the store's cash and checks; reconciling the store's cash receipts; ensuring that loss
prevention and other AutoZone guidelines are followed; making adjustments to inventory orders;
and setting performance expectations for subordinate employees.  *See* citations pages 6-11 *supra*.
Plaintiff's duties in this case clearly satisfy the "in charge" test set forth by the First Circuit in
*Donovan*.

---

*Meyer v. Worsley Companies.*, 881 F.Supp. 1014, 1019-20 (E.D.N.C. 1994) (finding that store
manager was "in charge" and exempt in a chain store that was highly standardized and afforded him
little input on day-to-day activities within the store and rejecting his argument that he "simply was
another shift worker who worked more hours than anyone else"); *Glefke v. K.F.C. Take Home Food*,
1 Wage & Hour Cas. 2nd 1081 (D. Mich. 1993) (holding that K.F.C. manager who was in charge
of store was an exempt executive despite the standardization of the store's operation); *Russell v. Mini
Mart, Inc.,* 711 F.Supp. 556 (D. Mont. 1988) (finding that convenience store manager was exempt
despite the standardization of the store's operations and the fact he spent the majority of his time
performing clerical duties where plaintiff's most important duties -- managerial duties -- were
performed simultaneously); *see also Donovan v. Burger King,* 675 F.2d 516 (2nd Cir. 1982)
(reaching the same conclusion as the First Circuit two months later under an identical set of facts).

[34] Plaintiff disagrees with the "in charge" analysis because he maintains that "this single prong
test is not provided for in the statutory scheme that Congress passed and is not present in the
regulations that the DOL has subsequently promulgated." (Doc. # 33, at 8-17). The court need not
decide whether the "in charge" analysis can substitute for the relevant factors identified in 29 C.F.R.
§541.103, because, as discussed above, the court finds that the balance of those factors indicates that
Plaintiff had management as his "primary duty."

Moreover, that Plaintiff had management as his "primary duty" is also established by an analysis of the five factors outlined in § 541.103, set forth on page 20 *supra*. First, Plaintiff testified that the "main part" of his job was supervision and direction of PSMs and red shirts. (Pl. Dep., p. 89). Although Plaintiff points out that many of the duties he performed as Assistant Manager were "manual" tasks, such as waiting on customers, merchandising, stocking, recovery of the store at the end of the night, and cleaning the store, Plaintiff's attempt to "down-play and minimize the importance of his position [by] testifying that he spent most of his time performing routine non-managerial jobs," is just the type of "post-hoc effort[] to minimize the relative importance of managerial duties" that other courts have rejected. *Haines v. Southern Retailers, Inc.,* 939 F.Supp. 441, 450 (E.D. Va. 1996) (quoting *Meyer v. Worsley Companies, Inc.,* 881 F.Supp. 1014, 1020 (E.D. N.C. 1994), and citing *Murray v. Stuckey's Inc.,* 939 F.2d 614, 618 (8th Cir. 1991); *Donovan v. Burger King Corp.,* 672 F.2d 221, 227 (1st Cir. 1982); *Horne v. Crown Cent. Petroleum, Inc.*, 775 F.Supp. 189 (D.S.C. 1991)).

Moreover, there is no doubt that AutoZone considered Plaintiff's "primary" duty to be management: "We primarily wanted the management people, store manager, assistant, part sales manager, managing the AutoZoners on duty but . . . we were also hands on deck when the customer needed to be waited on regardless of who was there." (Colley Dep., p. 52-53).  As another judge of this court previously noted, "under the short test, the employee's primary duty will usually be what he does that is of principal value to the employer, not the collateral tasks that he may perform, even if they consume more than half his time." *Lee v. Town of Good Hope,* 4 Wage & Hour Cas. 2d 1392, 1397 (N.D. Ala. 1998)(Hancock, J.) (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir.

25

1990).[35]  Moreover, although various store operations were subject to standardized, predetermined corporate guidelines, the manager on duty continued to have discretionary responsibility for these supervisory matters. (Knighten Dec., ¶ 9).  Finally, the undisputed evidence shows that Plaintiff, as ASM, was the second-highest paid employee in a given store (behind the Store Manager) (Knighten Dec., ¶ 12), and was paid considerably more than his subordinate AutoZoners. (Knighten Dec., ¶ 12).  Thus, Plaintiff had managment as his "primary duty" under both the "in charge" test and the § 541.103 factors.[36]

Given the undisputed evidence in this case, the court finds that Plaintiff was properly classified as an exempt manager because his primary duty consisted of management of the enterprise in which he was employed and included the customary and regular direction of the work of two or more other employees therein.

---

[35] That the management functions performed by Plaintiff and other AutoZone ASMs were essential to keep AutoZone competitive demonstrates that Plaintiff's management duties were of primary value to AutoZone.  *See Donovan v. Burger King,* 675 F.2d 516, 524 (2nd Cir. 1982) (reaching the same conclusion as the First Circuit two months later under an identical set of facts and finding that "the exercise of discretion . . . even where circumscribed by prior instruction, is as critical to that [commercial] success as adherence to 'the book'").

[36] Plaintiff also suggests that ASMs cannot be exempt because PSMs, who were non-exempt, occasionally performed some of the managerial/supervisory tasks regularly performed by Store Managers or ASMs. Under the FLSA, the simple fact that other non-exempt employees may perform various managerial-type tasks is irrelevant to the exemption analysis with regard to their superiors. *See e.g., Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1115 (9th Cir. 2001)(finding that fact that hourly assistants performed some of the tasks of their supervisors did not render those tasks nonexempt); *Murray v. Stuckey's Inc.,* 939 F.2d 614, 619 (8th Cir. 1991) (holding that it was irrelevant to the primary duty analysis "whether other employees who reported to the manager were capable of performing part or even all of the manager's duties").  Moreover, the undisputed evidence indicates that PSMs – unlike Store Managers and ASMs – were only "in charge" of a store for short periods of time each week and therefore did not "regularly and customarily" supervise two or more employees.

**B.      Summary Judgment Is Due to Be Granted Because, Even If AutoZone Improperly Classified Plaintiff as an Exempt Employee, It Did Not Willfully Violate the FLSA**

Under the FLSA, claims which are not the result of a willful violation are subject to a two-year statute of limitations, while willful FLSA violations are subject to a three-year statute of limitations. 29 U.S.C. § 255. It is undisputed that this lawsuit falls outside of the two-year statute of limitations because it was filed 25 months after September 10, 2000, when AutoZone began paying Plaintiff (and all other ASMs) on an hourly basis. Accordingly, in order to escape the bar of the statute of limitations, Plaintiff must demonstrate that AutoZone willfully violated the FLSA. For the reasons outlined below, the court finds that he has failed to do so. Therefore, even if Plaintiff could demonstrate that AutoZone's classification of him as "exempt" violated the FLSA, summary judgment is nonetheless appropriate because Plaintiff's claims are time-barred.

In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), the Supreme Court held that an employer commits a willful FLSA violation only when it "either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA." *McLaughlin*, 486 U.S. at 133. "Willful" refers to conduct that is "voluntary," "deliberate," or "intentional," and not merely negligent. *McLaughlin*, 486 U.S. at 133; *Reich v. Dept. of Conservation & Natural Resources*, 28 F.3d 1076, 1084 (11th Cir. 1994). A defendant cannot be found to have willfully violated the FLSA if it acted "on a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects," nor can willful violations result from "unreasonab[le], but not reckless[]" actions. *McLaughlin*, 486 U.S. at 133. "In reviewing the extent of an employer's awareness, a court 'need only inquire whether the circumstances ... were such that the employer either had knowledge or else had the opportunity through reasonable diligence to acquire knowledge.'" *Reich*, 28 F.3d at 1082.

27

Even assuming that AutoZone's decision to classify its ASMs as exempt executive employees violated the FLSA, the court finds that such conduct could not have constituted a willful violation given the volume of jurisprudence supporting AutoZone's classification. Defendants maintain – and the court agrees – that AutoZone's actions were bolstered both by the regulations in effect at the time and the clearly established case law of *Donovan* and its progeny which interpreted the regulations to mean that an employee who is "in charge" of a retail store has management as his or her primary duty regardless of the type of business or the standardization of its operation and regardless of the fact that the employee may frequently perform non-managerial duties while "in charge."[37] Therefore, based on the long-standing and consistent jurisprudence interpreting the FLSA, the court finds that AutoZone acted reasonably in deeming Plaintiff – who admittedly spend the vast

---

[37] Plaintiff's arguments on this issue are not persuasive. As noted earlier, the undisputed evidence shows that Plaintiff supervised more than 80 employee hours for the 49 weeks in dispute and therefore the court rejects Plaintiff's argument that AutoZone willfully violated the FLSA because it knew that Plaintiff could not direct two or more employees for a total of 80 hours each week. *See* discussion *supra* pages 13-20. Moreover, Plaintiff's argument that AutoZone "should have known that Plaintiff was not spending his time performing exempt functions" is meaningless in light of the fact that Plaintiff's performance of non-managerial functions does not remove him from the "exempt" category because management remained his primary duty. *See* discussion *supra* pages 20-26. Likewise, Plaintiff's claim that AutoZone willfully violated the FLSA because it knew that he was working 60-65 hours per week proves nothing – the number of hours Plaintiff worked each week simply has no bearing on whether he is properly exempt. Finally, AutoZone's decision to begin paying ASMs by the hour in September 2000 is not an admission that it had improperly classified ASMs as exempt. The undisputed evidence indicates that AutoZone made this change after the acquisition of Chief Auto Parts in California (whose assistant managers were paid on an hourly basis) and because of other relevant competition concerns. (Colley Dep., pp. 69-70). Regardless, post-litigation classification changes do not indicate willfulness. *See Gettridge v. Civic Ctr. Site Dev. Co., LLC*, 146 Lab. Cas. P 34, 560, *8 (E.D. La. 2002). ("[D]efendant's reclassification of plaintiff as an hourly employee and its payment of back overtime pay after the Department of Labor audit is not evidence that defendant willfully violated the FLSA.") (citing *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990)).

majority of his work week "in charge" of his stores – exempt from the FLSA's overtime requirements.

The evidence in this case does not support a finding that AutoZone violated the FLSA by classifying Plaintiff as an exempt executive employee, much less that such a violation was willful. Accordingly, the court finds that summary judgment is due to be granted because Plaintiff's claims are completely time-barred under the FLSA's two-year, non-willful statute of limitations.

## IV.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment is due to be granted. The court finds that no genuine issues of material fact remain for trial and that Defendants are entitled to judgment as a matter of law.  A separate order will be entered.

**DONE** and **ORDERED** this ____31st____ day of August, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE